## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ANTHONY DIMARZIO,

     *Plaintiff,*

*v.*                          CASE NO. 11-CV-15635

COMMISSIONER OF             DISTRICT JUDGE GERALD E. ROSEN
SOCIAL SECURITY,          MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, and Disability

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 39, 41.)

Plaintiff Anthony DiMarzio was 28 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 9 at 41, 137.) Plaintiff's employment history includes work as an insurance sales person for two years, a marketing vice president for one year, and a crew leader/lawn foreman for seven years. (Tr. at 151.) Plaintiff filed the instant claim on June 30, 2009, alleging that he became unable to work on November 15, 2008. (Tr. at 137.) The claim was denied at the initial administrative stage. (Tr. at 85.) In denying Plaintiff's claim, the Commissioner considered disorders of back, discogenic and degenerative, and affective disorders as possible bases for disability. (*Id.*) On May 21, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") Paul Armstrong, who considered the application for benefits *de novo*. (Tr. at 41-84, 88-107.) In a decision dated June 22, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 104.) Plaintiff requested a review of this decision on July 6, 2010. (Tr. at 133-36.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on November 24, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On December 23, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.[2]

## B.   Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is

---

[2]This case has a lengthy procedural history due, at least in part, to changes in representation.

multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making

3

a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

without directly addressing in his written decision every piece of evidence submitted by a party”); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

Judicial review of the ALJ's decision is direct, “but we play an 'extremely limited' role.” *Simila v. Astrue,* 573 F.3d 503, 513-14 (7th Cir. 2009). “We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence.” *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). Just as “'[n]o trial is perfect,' . . . no administrative hearing or opinion is either[;] thus, in analyzing an ALJ's decision, a reviewing court is to look for 'fatal gaps or contradictions' and not 'nitpick' in search of essentially meaningless missteps.” *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1965 (N.D. Ill. 2011).

### C.      Governing Law

The “[c]laimant bears the burden of proving his entitlement to benefits.” *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, “DIB and SSI are available only for those who have a 'disability.'” *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). “Disability” means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.  ALJ Findings**

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2013, and that Plaintiff had not engaged in substantial gainful activity since November 15, 2008, the alleged onset date. (Tr. at 93.) At step two, the ALJ found that Plaintiff's degenerative disc disease, degenerative joint disease of the left knee, chronic pain syndrome, depression, and anxiety were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 93-95.) At step four, the ALJ found that Plaintiff could not perform his past relevant work. (Tr. at 102.) At step five, the ALJ found that Plaintiff could perform a limited range of light work. (Tr. at 95-102.) The ALJ also found that Plaintiff was a younger individual (i.e., between the ages of 18 and 49) on the alleged disability onset date. (Tr. at 102.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 104.)

**E.  Administrative Record**

**1.  Physical Impairments**

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff injured his knee and had arthroscopic surgery in 2006. (Tr. at 265.) An MRI of Plaintiff's left knee taken on June 15, 2007, was "[n]ormal." (Tr. at 268.)

X-rays of Plaintiff's lumbosacral spine taken on January 25, 2008, were "[n]ormal." (Tr. at 272.) On January 25, 2008, Plaintiff was referred by Dr. Goitz to Shlomo Mandel, M.D., for his lower back and left leg pain. (Tr. at 208.) Dr. Mandel examined Plaintiff and noted that a previous

arthroscopy had been performed on Plaintiff's left knee. (*Id.*) Dr. Mandel also noted that Plaintiff was "in no distress because of pain" and that there was "no evidence of <___> low back with limited flexion and extension. There is also no evidence of kyphoscoliotic deformity. Mr. Dimarzio is able to walk on his heels and toes without weakness or ataxia." (Tr. at 208-09.) Dr. Mandel stated that Plaintiff was "positive for nerve tension in the left side and negative in the right [and] [h]e has brisk and equal patellar and Achilles reflexes reaction bilaterally." (Tr. at 209.) Dr. Mandel also indicated that Plaintiff's "mental status is normal[.]" (*Id.*)

Chest x-rays taken on January 29, 2008, showed "[l]ung and pleural spaces are clear. The heart is not enlarged. A mild dextro-convex thoracic scoliosis is shown. The remainder of the x-ray examination of the chest is negative." (Tr. at 252, 273.) X-rays of Plaintiff's lumbosacral spine taken that same day showed "[a] congenital anomaly is demonstrated with sacralization of L5. The rest of the lumbosacral spine is negative" and "[n]egative x-ray examination of the SI joints bilaterally." (*Id.*)

An MRI of the lumbar spine taken on January 30, 2008, revealed "[i]ntervertebral disc at L5-S1 abuts the exiting L5 nerve roots bilaterally. Mild facet arthropathy is present at L4-L5 and L5-S1 but no other significant stenoses or nerve root compression are seen." (Tr. at 250, 276.)

Plaintiff underwent an "L5 transforaminal steroid injection under fluoroscopic guidance, left" on February 4, 2008. (Tr. at 242.) On March 31, 2008, Plaintiff was examined by Suja Sukumar, M.D., who told Plaintiff that pain "has an emotional and a physical component and getting emotional about the pain and thinking about it can actually cause the pain to feel much worse than what it actually is. So he needs to be able to dissociate the emotional component of pain away from the physical part, that was it will be easier to control the physical component of the pain." (Tr. at 226.) On April 3, 2008, Dr. Sukumar indicated that Plaintiff was referred to "Dr.

8

Rock on March 25th for neurosurgical evaluation regarding his back pain and [that Dr. Rock concluded that Plaintiff] is not a neurosurgical candidate." (Tr. at 285.) On April 14, 2008, Henry Goitz, M.D., indicated that "we feel that Anthony has made significant improvement . . . we feel that there was no structural etiology for his pain. We've encouraged him to be as active as possible." (Tr. at 277.)

Plaintiff underwent lumbar epidural steroid injections at L5-S1 under biplanar fluoroscopy on May 30, June 28, and July 12, 2008. (Tr. at 441, 443, 445.) On August 4, 2008, an unltrasound of Plaintiff's left lower extremity showed "[n]onspherical shape of the left femoral head" and "[m]ild bilateral tendinopathy changes of the abductor muscle group origin." (Tr. at 249, 288.)

On August 23, 2008, an MRI of Plaintiff's left hip was "[n]ormal[.]" (Tr. at 248, 289.) On September 22, 2008, and MRI of the lumbar spine showed "[d]isc disease at the L5-S1 level is stable. There is mild foraminal narrowing at this level, with no exiting nerve root compression. No central stenoses are identified." (Tr. at 247, 290.) After viewing the results of this MRI, Dr. Sukumar recommended continuation of conservative treatment. (Tr. at 216.) Gregory Dudek, M.D., referred Plaintiff to a chiropractor in October 2008. (Tr. at 265-66.)

On December 1, 2008, an MRI of Plaintiff's cervical spine showed "[n]o significant canal or foraminal stenosis" and "[n]o abnormal signal or enhancement [] within the spinal cord." (Tr. at 448.) On December 29, 2008, Plaintiff was examined by Geoffrey Seidel, M.D. Dr. Seidel found Plaintiff's "sensation to light touch and pinwheel all dermatones of bilateral lower extremities including the buttock and posterior thigh, circumferentially about the both thighs, both knees, both claves, and then the feet" to be "normal[.]" (Tr. at 263.) Dr. Seidel found that Plaintiff had "no peripheral loss of sensation[,]" his "reflexes are 2+ and symmetrical[,]" he "has 5/5 strength of bilateral iliopsosas, gluteus medius, quadriceps, hamstrings, anteriro tibialis, and extensor hallucis

9

to manual muscle testing[,]" a "full range of motion about the hips," and a "full range of motion about the knees." (*Id.*) Dr. Seidel indicated that Plaintiff "has reasonable strength though there is atrophy" and that Plaintiff "may benefit from a strengthening program." (Tr. at 264.) Dr. Seidel also indicated that he wanted to see the results of the EMG and MRIs. (*Id.*)

On January 23, 2009, nerve conduction studies were "[n]ormal" with "[n]o electrodiagnostic evidence of sensory and motor peripheral polyneuropathy" and "[n]o electrodiagnostic evidence of left lumbosacral radiculopathy." (Tr. at 260.) On January 30, 2009, Dr. Seidel examined Plaintiff and indicated that Plaintiff "has no neurophysiologic abnormality in the left lower extremity" and that the recent "MRI of the lumbar spine revealed no significant abnormality[;]" thus, Plaintiff "does not need surgical intervention in any location." (Tr. at 300.) Dr. Seidel also stated that Plaintiff "does not need further diagnostic testing. He needs to dedicate himself to a strengthening program and learn[] to cope with the injury that he has had." (*Id.*)

On April 16, 2009, Dr. Seidel indicated that Plaintiff should "continue with physical therapy, pursue home exercise program to strengthen thigh musculature to support the knee" and that he should "resume normal activity profile whenever possible." (Tr. at 299.)

On April 28, 2009, nerve conduction studies showed the "left peroneal/EDB CMAP distal latency is prolonged. The remainder of the nerve conductions are normal" and that the "needle examination is normal[.]" (Tr. at 254.) The distal latency was thought to be "due to his previous history of surgery[.]" (*Id.*)

On May 7, 2009, Dr. Sukumar examined Plaintiff and found Plaintiff to be neurologically "[u]nchanged compared to the last time I saw him on the 28th of April." (Tr. at 211.) Dr. Sukumar indicated that there was "no evidence of motor weakness in his legs. His gait is normal. He has full range of motion of the hip joint, and his reflexes are 2+." (*Id.*) Dr. Sukumar noted that Plaintiff

was taking medication for anxiety. (*Id.*) On May 12, 2009, Dr. Sukumar indicated that an EMG "showed evidence of a possible chronic prolonged latency of the left peroneal nerve which is the chronic finding, [and] might be related to his previous knee surgery. Otherwise the EMG did not show any other abnormalities." (Tr. at 213.) In addition, an "MRI showed no evidence of any abnormalities in the left hip. He had no tear, no stress injury, no fracture, no AVN or avascular necrosis. No evidence of bursitis. There was a subtle degree of chondromalacia of the left hip, but otherwise was normal." (*Id.*) Dr. Sukumar also noted Plaintiff had "no weakness in his legs. He has no gait problems. He is able to walk properly without problems." (*Id.*)

On July 13, 2009, Plaintiff underwent an "L5-S1 epidural steroid injection under fluoroscopic guidance, directed left." (Tr. at 420.) On August 27, 2009, Plaintiff underwent a "sacroiliac joint steroid injection, left." (Tr. at 386.)

On September 1, 2009, Dr. Sukumar completed a Medical Examination Report at the request of the Michigan Department of Human Services. (Tr. at 382-84.) All examination areas were normal except some atrophy was noted in Plaintiff's left quadriceps, and Dr. Sumukar indicated that Plaintiff was under a temporary disability such that Plaintiff could be expected to return to work "tentative in 1 year." (Tr. at 383.) Dr. Sukumar concluded that Plaintiff should not be required to lift and carry any weight, that he could stand or walk less than 2 hours in an 8-hour workday, that he could sit less than 6 hours in an 8-hour workday, that he was able to use his arms, hands, and right leg and foot to operate repetitive controls. (*Id.*)

On September 2, 2009, Dr. Sukumar wrote a one paragraph letter indicating that Plaintiff "is totally disabled" because although they "have tried adjusting his medications to see if that will improve his functional capacity [] he still continues to suffer from significant pain is his left leg and is unable to work for this reason." (Tr. at 381.)

A Physical Residual Functional Capacity ("RFC") Assessment was completed on August 10, 2009, by Muhammed Ahmed, M.D. (Tr. at 321-28.) The assessment concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in his ability to push or pull. (Tr. at 322.) The assessment also concluded that Plaintiff should only occasionally be required to perform postural tasks, but there were no manipulative, visual, communicative or environmental limitations established. (Tr. at 323-25.) The assessment concluded that Plaintiff was only "partially credible" and that "[his impairment would not limit his ability to perform work related activities 8 hours a day 40 hours a week on a sustained basis[.]" (Tr. at 328.)

On September 24, 2009, Plaintiff underwent a "[b]ilateral T10-T11 intraarticular facet injection under fluoroscopic guidance." (Tr. at 379-80.) On December 24, 2009, Plaintiff underwent a lumbar facet injection with steroid under biplanar fluoroscopy. (Tr. at 439.)

On March 13, 2010, Dr. Sukumar noted that Plaintiff's "[g]ait is normal" and that Plaintiff "has evidence of muscle tenderness, but he has a full range of motion of his spine though and no neurological deficits on exam." (Tr.a t 372.) Dr. Sukumar stated that Plaintiff "needs to be taught different methods of dealing with pain, so he needs to see a psychiatrist[.]" (*Id.*)

On March 12, March 26, April 7 and April 15, 2010, Plaintiff underwent a "Lumbar Sympathetic nerve block with biplanar fluoroscopy." (Tr. at 427-38.)

### 2.    Psychological Impairments

On August 25, 2009, Plaintiff was examined at the request of Disability Determination Services ("DDS") by Nick Boneff, Ph.D., who diagnosed "[a]djustment reaction with disturbance of mood and panic attacks and assessed a GAF score of 45 "based on medical condition." (Tr. at 331.) Dr. Boneff opined that the "severity and chronicity of his pain likely interferes with

concentration and attention at times such that he would have difficulty doing sustained work but would probably be able to do part time simple routine task not requiring any physical activity or heavy labor. Cognitively he appears to be of at least low average intelligence consistent with his two years of college and work history." (*Id.*)

A Psychiatric Review Technique completed by Kathy A. Morrow on September 7, 2009, concluded that Plaintiff has affective and anxiety-related disorders, i.e., adjustment disorder with disturbance of mood, and panic disorder. (Tr. at 334, 337, 339.) Plaintiff was assessed as having moderate limitations in activities of daily living and in maintaining concentration, persistence or pace, but only mild limitations in maintaining social functioning. (Tr. at 344.) The assessment noted that Plaintiff had been prescribed medication for anxiety since December of 2008. (Tr. at 346.)

A Mental RFC Assessment completed on September 7, 2009, by Ms. Morrow concluded that Plaintiff is moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to maintain attention and concentration for extended periods, but was not significantly limited in understanding and memory, sustained concentration and persistence. (Tr. at 348-49.) Plaintiff was also found to be moderately limited in the ability to set realistic goals or make plans independently of others but was otherwise not significantly limited in social interaction or adaptation. (Tr. at 349.) The assessment concluded the severity of symptoms alleged by Plaintiff "are not currently supported" especially where his psychological symptoms "do not significantly limit [him] on daily basis." (Tr. at 350.) The assessment also found that Plaintiff "retains the mental capacity to sustain an independent routine of simple work activity" and that Plaintiff "[c]an tolerate low stress social demands and adapt to

simple changes in routine" but that he "may be limited in meeting more complex and detailed work demands." (*Id.*)

Plaintiff sought psychological treatment with Patrick Cavell, L.P.C., beginning in December 2009. (Tr. at 363-66.) On February 18, 2010, Cavell completed a mental RFC assessment where he concluded that Plaintiff was moderately limited in his ability to understand and remember detailed instructions and the ability to carry out detailed instructions, markedly limited in his ability to maintain attention and concentration for extended periods, in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, but was either not limited at all or not significantly limited in his ability to make simple work-related decisions, sustain an ordinary routine without supervision, work in coordination and proximity to others, or in the ability understand, remember, and carry out simple, one or two-step instructions. (Tr. at 367-68.) Plaintiff was also found to be moderately limited in all areas of adaptation except for being markedly limited in the ability to set realistic goals or make plans independently of others. (Tr. at 368.) Plaintiff was not found to be significantly limited in any areas of social interaction. (*Id.*)

On March 23, 2010, Cavell indicated that Plaintiff was never hospitalized for mental health issues, had "some counseling in 3rd grade because of some problems resulting from his parent's divorce" and that Plaintiff "believes that they were resolved then." (Tr. at 361.) It was also noted that "[a]part from the problems with his leg and nerve damage, he is in good physical condition." (*Id.*) Plaintiff's presentation, mental functioning, higher order abilities, and thought form and content were all found to be normal, intact, accurate, and logical. (Tr. at 362.) Plaintiff's

intelligence was rated as "high." (*Id.*) Plaintiff was diagnosed with Pain Disorder associated with both psychological factors and an Axis III disorder and was assessed a GAF score of 41-50, with a severe stress rating. (*Id.*)

### 3.    Plaintiff's Report

In his Daily Function Report, Plaintiff indicated that he lives with his wife and that he used to be the main financial provider. (Tr. at 182.) Plaintiff stated that he is able to attend to his own personal needs, prepare simple meals on a daily basis, do dishes and laundry once or twice a week, go outside once or twice a day, drive a car, handle finances, watch television, read, and socialize with friends. (Tr. at 182-86.)

### 4.    Vocational Testimony

The ALJ asked the vocational expert ("VE") to assume a person with Plaintiff's background who is "limited to light exertion and because of pain, side effects from medication, panic attacks and the like he's limited to simple, unskilled work." (Tr. at 76.) The VE responded that such a person could not return to Plaintiff's past relevant work as a landscape laborer or a door-to-door insurance sales representative, but could perform the 15,000 hand packager and 12,500 small products assembler jobs available at the light exertional level in Southeastern Michigan. (Tr. at 76-77.) The ALJ then asked the VE to consider the additional limitation to sedentary level work and the VE responded that there would be unskilled work at the sedentary level, such as the 3,250 bench assembler, 3,250 packager, and 1,500 visual inspector jobs. (Tr. at 77-78.) The VE indicated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 75.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of light work. (Tr. at 95-102.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 39.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ failed to properly assess Plaintiff's mental limitations and failed to give proper weight to the opinion and assessment of the consultative psychologist and Plaintiff's treating sources (Doc. 39 at 20-25), and that the ALJ's hypothetical did not accurately portray Plaintiff's residual functional capacity. (*Id.* at 25-29.) Under the latter

argument, Plaintiff contends that the limitation to unskilled work failed to properly account for moderate limitations in concentration, persistence or pace. (*Id.* at 27-29.)

###### a.     Medical Sources

"Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-3p, 2006 WL 2329939, at *2 (2006).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

Since the Commissioner is responsible for determining whether a claimant meets the statutory definition of disability, the ALJ "will not give any special significance to the source of an opinion[, including treating sources], on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section[,]" i.e., whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, residual functional capacity, and application of

vocational factors. 20 C.F.R. § 404.1527(d)(3). A "[d]octor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011). "Otherwise, the hearing would be a useless exercise." *Id.*

In addition, "a treating physician's assessment may be unreliable because of the bias he or she may bring to the disability evaluation," i.e., he or she "'may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.'" *Id.* at 1073 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)). "Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh . . . .'" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). Once the treating source is placed on the same level as other medical opinions, the treating source opinion should not be subjected to "greater scrutiny" than the non-treating sources, especially when there are more flagrant inconsistencies in the opinions of the non-treating sources. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379-80 (6th Cir. 2013).

If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the treating source opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the

record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. These factors may be applied to all medical opinions, not just treating sources. SSR 06-3p, 2006 WL 2329939, at *3 (2006). However, because of the special status of treating source opinions, where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error." *Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "Acceptable medical sources" who can be considered treating sources include "licensed or certified psychologists." SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). After treating sources, a "nontreating source, who physically examines the patient 'but does not have, or did not have an ongoing treatment relationship with' the patient, falls next along the continuum." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). "'The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.''" *Adams v. Massanari*, 55 F. App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent

19

reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Plaintiff contends that the ALJ improperly focused on Dr. Boneff's conclusion that Plaintiff could perform simple, routine tasks but ignored Dr. Boneff's statement that "'the severity and chronicity of his pain likely interferes with concentration and attention at times such that he would have difficulty doing sustained work but would probably be able to do part time simple routine tasks not requiring any physical activity or heavy labor.'" (Doc. 39 at 21, citing Tr. at 331.) I suggest that the ALJ thoroughly considered all the medical evidence and the opinions of the various treating and examining physicians (Tr. at 96-102) and that the ALJ's findings are supported by substantial evidence.

As to Dr. Boneff (and Ms. Czarnecki's) opinion, the ALJ indicated that he "afforded no weight to Ms. Czarnecki's views on the claimant's capacity to perform physical work-related activities as she has no professional background or qualifications to make such judgments." (Tr. at 96.) The ALJ also stated that he "did find her view that the claimant could perform simple, routine tasks persuasive because it is wholly consistent with the findings of her mental status examination of the claimant." (Tr. at 96-97.) The ALJ applied the proper standards for evaluating opinion evidence. First, since Dr. Boneff and Ms. Czarnecki are not specialists in physical health, their opinion regarding the impact of physical impairments was properly discounted. *Johnson,* 652

25

F.3d at 651. In addition, since the Commissioner is responsible for determining whether a claimant meets the statutory definition of disability, the ALJ was not required to accept Dr. Boneff or Ms. Czarnecki's conclusion that Plaintiff could only perform part-time work. 20 C.F.R. § 404.1527(d)(3). This is especially so, where, as here, the opinion was based solely on Plaintiff's reported level of pain and its effects rather than medical evidence. *Masters,* 818 F. Supp. 2d at 1067. I therefore suggest that the ALJ properly considered and weighed the opinions of Dr. Boneff and Ms. Czarnecki.

I further suggest that the ALJ's findings are in accord with the medical evidence and opinions of his treating physicians, which take priority over examining sources. On May 7, 2009, Dr. Sukumar examined Plaintiff and found Plaintiff to be neurologically "[u]nchanged compared to the last time I saw him on the 28th of April." (Tr. at 211.) Dr. Sukumar indicated that there was "no evidence of motor weakness in his legs. His gait is normal. He has full range of motion of the hip joint, and his reflexes are 2+." (*Id.*) On September 1, 2009, Dr. Sukumar completed a Medical Examination Report at the request of the Michigan Department of Human Services. (Tr. at 382-84.) All examination areas were normal except some atrophy was noted in Plaintiff's left quadriceps, and Dr. Sumukar indicated that Plaintiff was under a temporary disability such that Plaintiff could be expected to return to work "tentative in 1 year." (Tr. at 383.) On March 13, 2010, Dr. Sukumar noted that Plaintiff's "[g]ait is normal" and that Plaintiff "has evidence of muscle tenderness, but he has a full range of motion of his spine though and no neurological deficits on exam." (Tr. at 372.) Dr. Sukumar repeatedly warned Plaintiff that Plaintiff's emotions were making him feel much worse than the actual pain level he was experiencing. (Tr. at 226, 372.) Additionally, Dr. Goitz stated that "we feel that Anthony has made significant improvement . . .

we feel that there was no structural etiology for his pain. We've encouraged him to be as active as possible." (Tr. at 277.)

Dr. Seidel found that Plaintiff had "no peripheral loss of sensation[,]" his "reflexes are 2+ and symmetrical[,]" he "has 5/5 strength of bilateral iliopsosas, gluteus medius, quadriceps, hamstrings, anteriro tibialis, and extensor hallucis to manual muscle testing[,]" a "full range of motion about the hips," and a "full range of motion about the knees." (Tr. at 263.) On January 30, 2009, Dr. Seidel examined Plaintiff and indicated that Plaintiff "has no neurophysiologic abnormality in the left lower extremity" and that the recent "MRI of the lumbar spine revealed no significant abnormality[;]" thus, Plaintiff "does not need surgical intervention in any location." (Tr. at 300.) Dr. Seidel also stated that Plaintiff "does not need further diagnostic testing. He needs to dedicate himself to a strengthening program and learn[] to cope with the injury that he has had." (*Id.*) On April 16, 2009, Dr. Seidel indicated that Plaintiff should "continue with physical therapy, pursue home exercise program to strengthen thigh musculature to support the knee" and that he should "resume normal activity profile whenever possible." (Tr. at 299.)

### b.    RFC Findings

I suggest that substantial evidence supports the ALJ's RFC analysis. In the instant case, the ALJ found that Plaintiff could perform a limited range of light work. (Tr. at 95-102.) Specifically, the ALJ asked the VE to assume a person "limited to light exertion and because of pain, side effects from medication, panic attacks and the like he's limited to simple, unskilled work." (Tr. at 76.) Plaintiff contends that the limitation to unskilled work failed to properly account for moderate limitations in concentration, persistence or pace. (Doc. 39 at 27-29.) This argument is "not uncommon and the case law resolves it both ways." *Hernandez v. Comm'r of Soc. Sec.*, No.

22

10-cv-14364, 2011 WL 4407225, at *9 (E.D. Mich. Aug. 30, 2011) (collecting cases). The

*Hernandez* court stated that

> a hypothetical simply limiting a claimant to unskilled work may, in some instances,
> fail to capture a claimant's moderate limitation in concentration, persistence, or pace
> . . . . However, the Court also finds that there is no bright-line rule requiring remand
> whenever an ALJ's hypothetical includes a limitation of, for example, "unskilled
> work" but excludes a moderate limitation in concentration. Rather this Court must
> look at the record as a whole and determine if substantial evidence supports the
> ALJ's hypothetical and RFC assessment.

*Id.* at *10 (citations omitted). Looking at the record as a whole, I suggest that the ALJ's findings

are supported by substantial evidence.

Although Ms. Morrow concluded that Plaintiff is moderately limited in the ability to

understand and remember detailed instructions, the ability to carry out detailed instructions, and

the ability to maintain attention and concentration for extended periods, she also found that

Plaintiff was not significantly limited in understanding and memory, sustained concentration and

persistence. (Tr. at 348-49.) She concluded that the severity of symptoms alleged by Plaintiff "are

not currently supported," especially where his psychological symptoms "do not significantly limit

[him] on daily basis." (Tr. at 350.) The assessment also found that Plaintiff "retains the mental

capacity to sustain an independent routine of simple work activity" and that Plaintiff "[c]an

tolerate low stress social demands and adapt to simple changes in routine" but that he "may be

limited in meeting more complex and detailed work demands." (*Id.*) In addition, Cavell's

assessment concluded that Plaintiff was either not limited at all or not significantly limited in his

ability to make simple work-related decisions, sustain an ordinary routine without supervision,

work in coordination and proximity to others, or in the ability understand, remember, and carry

out simple, one or two-step instructions. (Tr. at 367-68.) Cavell noted in March 2010 that

Plaintiff's presentation, mental functioning, higher order abilities, and thought form and content

were all found to be normal, intact, accurate, and logical, and that Plaintiff's intelligence was "high." (Tr. at 362.)

I therefore suggest that the record as a whole provides substantial evidence supporting the ALJ's hypothetical and the RFC assessment limiting Plaintiff to simple, unskilled work. *See Infantado v. Astrue*, 263 F. App'x 469, 477 (6th Cir. 2008) (substantial evidence supported ALJ's decision where, although the psychiatrist found "moderate" limitations in the plaintiff's ability to maintain attention and concentration for extended periods, the psychiatrist noted the plaintiff's daily activities and concluded that the plaintiff was capable of performing simple tasks on a sustained basis); *Burnett v. Comm'r of Soc. Sec.*, No. 10-cv-14739, 2012 WL 3870362, at *7 (E.D. Mich. Sept. 6, 2012) (where physician finding moderate limitations in concentration, persistence and pace also concluded that the plaintiff is able to perform unskilled work, ALJ's reliance on limitation to unskilled work was not improper); *Cummings v. Comm'r of Soc. Sec.*, No. 10-11621, 2011 WL 3958473 (E.D. Mich. Sept. 8, 2011) (ALJ's omission of concentration and pace limitations in the hypothetical was reasonable where doctor who concluded that the plaintiff had "serious concentration and attention difficulties" also found that his "ability to work may not be severely impaired as long as the job does not involve any appreciable amount of contact with people"); *Young v. Comm'r of Soc. Sec.*, No. 10-cv-11329, 2011 WL 2601014 (E.D. Mich. May 23, 2011) (although the plaintiff cited to moderate limitations noted in the assessment, the plaintiff failed to mention that the same assessment also concluded that the plaintiff was capable of unskilled work).

As to the ALJ's physical RFC findings, I suggest that the ALJ's analysis is also supported by substantial evidence. Although Plaintiff injured his knee and had arthroscopic surgery in 2006 (Tr. at 265), there is no medical evidence to support that this injury or any other condition is

disabling. An MRI of Plaintiff's left knee taken on June 15, 2007, was "[n]ormal." (Tr. at 268.) X-rays of Plaintiff's lumbosacral spine taken on January 25, 2008, were also "[n]ormal." (Tr. at 272.) "Plaintiff was able to walk on his heels and toes without weakness or ataxia." (Tr. at 208-09.) An MRI of the lumbar spine taken on January 30, 2008, revealed "[i]ntervertebral disc at L5-S1 abuts the exiting L5 nerve roots bilaterally. Mild facet arthropathy is present at L4-L5 and L5-S1 but no other significant stenoses or nerve root compression are seen." (Tr. at 250, 276.) After having been sent to Dr. Rock for a neurosurgical evaluation regarding his back pain, Dr. Rock concluded that Plaintiff was "not a neurosurgical candidate." (Tr. at 285.) Dr. Goitz found "no structural etiology for his pain. We've encouraged him to be as active as possible." (Tr. at 277.) On August 23, 2008, an MRI of Plaintiff's left hip was "[n]ormal[.]" (Tr. at 248, 289.) On September 22, 2008, an MRI of the lumbar spine showed "[d]isc disease at the L5-S1 level is stable. There is mild foraminal narrowing at this level, with no exiting nerve root compression. No central stenoses are identified." (Tr. at 247, 290.) After viewing the results of this MRI, Dr. Sukumar recommended continuation of conservative treatment. (Tr. at 216.) On December 1, 2009, an MRI of the cervical spine showed "[n]o significant canal or foraminal stenosis" and "[n]o abnormal signal or enhancement [] within the spinal cord." (Tr. at 448.) Dr. Seidel found that Plaintiff had "no peripheral loss of sensation[,]" his "reflexes are 2+ and symmetrical[,]" he "has 5/5 strength of bilateral iliopsosas, gluteus medius, quadriceps, hamstrings, anteriro tibialis, and extensor hallucis to manual muscle testing[,]" a "full range of motion about the hips," and a "full range of motion about the knees." (Tr. at 263.) On January 23, 2009, nerve conduction studies were "[n]ormal"with "[n]o electrodiagnostic evidence of sensory and motor peripheral polyneuropathy" and "[n]o electrodiagnostic evidence of left lumbosacral radiculopathy." (Tr. at 260.) On April 28, 2009, nerve conduction studies showed the "left peroneal/EDB CMAP distal

latency is prolonged. The remainder of the nerve conductions are normal" and that the "needle examination is normal[.]" (Tr. at 254.) The distal latency was thought to be "due to his previous history of surgery[.]" (*Id.*)

I further suggest that the ALJ's RFC analysis properly incorporated the limitations delineated in the RFC Assessment. (Tr. at 321-28.) In addition, the ALJ's findings are supported by the assessment's conclusion that "[h]is impairment would not limit his ability to perform work related activities 8 hours a day 40 hours a week on a sustained basis[.]" (Tr. at 328.)

I also note that Plaintiff's treatment for his physical and mental impairments was modest, consisting of prescription medication and some epidural steroid injections. Such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007).

I further suggest that the RFC analysis is supported by Plaintiff's own statements that he is able to attend to his own personal needs, prepare simple meals on a daily basis, do dishes and laundry once or twice a week, go outside once or twice a day, drive a car, handle finances, watch television, read, and socialize with friends. (Tr. at 182-86.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗
CHARLES E. BINDER
United States Magistrate Judge

Dated: June 24, 2013

### **CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  June 24, 2013                          By____s/Patricia T. Morris_____
                                                        Law Clerk to Magistrate Judge Binder

27